UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY C. AMBRO,

        Plaintiff,                        Case No. 2:11-cv-173
                                                  JUDGE GREGORY L. FROST
    v.                                        Magistrate Judge E.A. Preston Deavers

HOLTEC INTERNATIONAL,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 47), Plaintiff's Memorandum in Opposition (ECF No. 48), and Defendant's Reply in Support (ECF No. 50). For the reasons that follow, the Defendant's Motion is **GRANTED** and the Clerk is directed to enter final judgment in favor of the Defendant.

### I. Factual and Procedural Background

Plaintiff Timothy Ambro has more than 30 years of experience working in the aluminum industry. In 2003, he began working for a company called Pro-Fab Industries, Inc. ("Pro-Fab"), as an independent sales representative. In connection with that engagement, Plaintiff in March 2003 signed a Confidentiality Agreement, in which he agreed to maintain the confidentiality of Pro-Fab's "confidential information." The Agreement defined the term "confidential information" broadly to include (without limitation) "all customer lists, locations and customer information, pricing policies, systems, memoranda, drawings, specifications, photographs, programs, data, trade secrets, features, techniques, copyrighted matter, patented or patentable inventions, plans, methods, marketing plans, objectives, or other materials of any nature relating

1

to any matter within the scope of the business of" Pro-Fab. (ECF No. 47-2, at 10.)

The Agreement expressly stated that it would be effective "for a period of five years from the date hereof" unless earlier terminated. By its terms, the agreement expired in March 2008.

Within a few months of Plaintiff becoming an independent sales representative, Plaintiff became a full-time Sales Manager employed by Pro-Fab. Plaintiff did not sign a new confidentiality agreement. Plaintiff did, however, sign an acknowledgment that he had received and reviewed Pro-Fab's Employee Handbook. (ECF No. 43-2, Ambro Dep., Ex. E.) At Section 5 of the Employee Handbook was a provision entitled "Confidential Matters," which stated—

> The protection of confidential business information and trade secrets is vital to the interest and the success of Pro-Fab Industries, Inc.
> ...
> Employees who are exposed to confidential information may be required to sign a non-disclosure agreement as a condition of employment. Any employee who discloses trade secrets or confidential business information will be subject to disciplinary action up to and including possible discharge and/or possible legal action, even if he or she does not actually benefit from the disclosed information.

(ECF No. 43-2, Ambro Dep., Ex. D.)

The provision defined "confidential information" to include, without limitation, such things as compensation data, customer list and revenue levels, financial information, pricing information, marketing strategies, pending projects and proposals, and proprietary production processes. (*Id.*)

Pro-Fab was made up two divisions — the aluminum fabrication business and the aluminum extrusion business. Pro-Fab's extrusion business produced "billets" of aluminum by extruding them through large presses at its Youngstown, Ohio plant. These aluminum billets were then either sold to customers or provided as raw material to Pro-Fab's fabrication division for fabrication and eventual sale.

Defendant Holtec Industries ("Holtec") is a Delaware corporation headquartered in Marlton, New Jersey. Holtec supplies equipment to various customers in the energy industries, with particular emphasis on the nuclear power industry. In 2008, Holtec purchased Metamic, LLC, an affiliated company of Pro-Fab that was in the business of extruding Metamic™ billets that were in demand for use in the nuclear power industry. Several months after acquiring Metamic, LLC, Holtec purchased the assets of Pro-Fab and reorganized their operations under the name Orrvilon, Inc., which was a wholly owned subsidiary of Holtec. Orrvilon offered many Pro-Fab employees, including Plaintiff, continued employment after the Holtec acquisition of Pro-Fab.

Plaintiff worked for Orrvilon until May 2010, when he resigned to accept a job with Extruded Aluminum Corporation ("EAC"). As its name implies, EAC is involved in the aluminum extrusion business. Though Plaintiff denied ever competing with EAC when he worked for Orrvilon, he acknowledged that EAC and Orrvilon pursued the same potential customers in the same market. (ECF No. 43-1, Ambro Dep., at 108.)

Plaintiff became acquainted with EAC through MetalJobs, a professional recruiter. During the job interview process, Plaintiff met with Charles Hall, the President of EAC. Both Hall and Plaintiff acknowledge that they discussed what customers Plaintiff believed he could bring from Orrvilon to EAC. (ECF No. 43-1, Ambro Dep., at 106-07; ECF No. 46-1, Hall Dep., at 60-61.) From the interview, Hall was under the impression that Orrvilon was "jettisoning" a certain segment of its extrusion business and was interested in the possibility of Plaintiff helping EAC take over that business "[i]f what we were told was correct, that [Orrvilon/Holtec] no longer wanted it." (ECF No. 46-1, Hall Dep., at 61.) Hall also asked Plaintiff during the

interview process whether he was bound by a non-compete agreement with his then-current employer (*i.e.*, Holtec/Orvillon). Plaintiff replied truthfully that was not bound by a non-compete agreement. Hall did not ask specifically whether Plaintiff was bound by a confidentiality agreement apart from a non-compete agreement.

It is not disputed that the aluminum extrusion business is highly competitive. Because of the highly competitive nature of the industry, it is not unusual for customers to be gained or lost due to a small price differential between competing businesses. As part of his job with Orrvilon, it is not disputed that Plaintiff was privy to information regarding the company's operations, including sales strategies, pricing information, customer information, and information concerning company products and processes. Of particular importance to Orrvilon and Holtec, Plaintiff was exposed to details regarding the Metamic™ line of business, much of which was not publicly disclosed.

Shortly after Plaintiff resigned from his employment at Orrvilon, Holtec became aware that Plaintiff was going to work for EAC, which Holtec considered a direct competitor in the industry. Nick Abraczinskas, Holtec's New Jersey-based Director of Finance and Contracts, was tasked with coordinating Plaintiff's exit from the company's employ. One of Abraczinskas's tasks was to determine whether Plaintiff had signed a confidentiality agreement. Through communications with Orrvilon's human resources department in Ohio, Abraczinskas learned that Plaintiff had signed a confidentiality agreement in the past (the aforementioned 2003 agreement with Pro-Fab) and was also subject to the terms of an employee handbook that made reference to the protection of confidential company information. (ECF 47-2, Abraczinskas Decl.) Abraczinskas could not, however, immediately locate a copy of the confidentiality agreement.

Despite not having a copy of the confidentiality agreement Plaintiff signed in 2003, Abraczinskas instructed Holtec's Corporate Counsel, Marc Nocera, to draft a letter to EAC regarding what he believed to be Plaintiff's confidentiality obligations. On May 27, 2010, Nocera, sent the following letter to Hall:

> Dear Mr. Hall:
>
> We understand that Tim Ambro has accepted a position with the Extruded Aluminum Corporation following his resignation from Orrvilon, Inc., a Holtec International ("Holtec") related entity on or about May 14, 2010. To avoid any potential misunderstandings in the future, this letter is to advise you of the scope and importance of the continuing obligations that Mr. Ambro has to Holtec following his separation from employment from Holtec.
>
> In addition to the obligations that Mr. Ambro has under the law, Mr. Ambro has continuing obligations as a result of a confidentiality agreement and an employee handbook that Mr. Ambro executed on June 30, 2003. In both agreements, Mr. Ambro expressly agreed to protect confidential business information and trade secrets.
>
> As you are aware, Mr. Ambro served Holtec in a position of trust and leadership as a Sales Manager. It is important to Holtec that Mr. Ambro honors and holds in confidence the proprietary and confidential information to which he was privy during his employment with Holtec. In particular, it is imperative that he not utilize any training materials that he developed and/or worked on during his tenure with Holtec or any confidential or proprietary information relating to the identity of Holtec customers, their requirements or key contacts. We want to be sure that you realize Mr. Ambro is not at liberty to share with you any marketing, sales and promotional plans and activities, strategic plans, pending projects or proposals, pricing information, business methods, trade secrets or other confidential information. We ask that Extruded Aluminum Corporation take all appropriate steps to ensure that Mr. Ambro does not disclose any of Holtec's confidential and proprietary information or otherwise breach his obligations to Holtec.
>
> We recognize that both Extruded Aluminum Corporation and Holtec seek to manufacture aluminum extrusions and, as such, are competitors. We have appreciated this competitive business relationship and trust that Extruded Aluminum Corporation will act ethically and with integrity moving forward.

>Should you have questions or comments, please do not hesitate let [*sic*] us know. Thank you in advance for your anticipated cooperation.
>
>Very truly yours,
>
>Marc Nocera
>Corporate Counsel
>Holtec International

(ECF No. 47-2, Exh. A ("Holtec Letter").)

The record evidence reveals that there are at least two statements in the second paragraph of the Holtec Letter that are technically untrue. First, Plaintiff did *not* have "continuing obligations" under the Confidentiality Agreement signed in March 2003, as that agreement expired by its own terms no later than March 2008. Second, to the extent the Holtec Letter calls the Employee Handbook an "agreement" in the contractual sense, the statement is inaccurate. Though the Employee Handbook addressed employees' obligation not to disclose the company's confidential information, the Handbook also makes clear that it was *not* a contract of any kind. (ECF No. 43-2, Ambro Dep., Ex. E.)

Hall promptly responded to Nocera's letter, assuring Holtec that EAC would not misappropriate any trade secret or confidential information. (ECF 46-2, Hall Dep. Ex. 6.) Hall requested, however, to see the Employee Handbook provision that Holtec relied upon, so that EAC's counsel could review it and "understand precisely what [Plaintiff] signed." (*Id.*) EAC's counsel, Donald E. Duba, followed up that request with a letter to Nocera on June 7, 2010, in which he asked Nocera to provide copies of "the relevant Holtec or predecessor Employee Handbook in existence as of June 30, 2003 and/or any other confidentiality, non-competition or other specific contractual agreements. To the extent that this request is ignored, [EAC] will conduct its actions going forward with the understanding that none so exist." (ECF 46-2, Hall

6

Dep. Ex. 7.)

Nocera responded to the Duba letter the following day via e-mail.  Nocera expressed satisfaction with Hall's previous assurances that EAC would not utilize confidential information held by Plaintiff.  Nocera did not, however, provide copies of any of the documents that Duba requested in his letter.  (ECF 46-2, Hall Dep. Ex. 8.)  According to Abraczinskas, Holtec considered the matter "closed" at this point.  (ECF No. 47-2, Abraczinskas Decl., ¶¶ 14-15.)

On July 6, 2010, EAC terminated Plaintiff's employment, citing the communications it had received from Holtec.  In the termination letter, signed by Hall, EAC expressed that it was "uncertain regarding Holtec's position and intent relative to possible violations to [*sic*] contract, statutory or common law business obligations" of Plaintiff.  (ECF No. 46-2, Hall Dep. Ex. 14.)  The letter further stated that "Holtec has made it clear that they [*sic*] intend to litigate any obligations that you owe to them based on your past performance and exposure to confidential business data and [EAC] does not desire to defend or incur costs related to defense of itself relative to your conduct that would be required in the course of your sales representative position with [EAC]." (*Id.*)  In a separate e-mail to Plaintiff, an EAC vice president reiterated this sentiment, stating that "legal issues have forced our hand in making this move." (*Id.*, Ex. 15.)

Holtec later learned that EAC terminated Plaintiff's employment.  On August 10, 2010, a short time after learning of EAC's decision, Abraczinskas wrote Hall a letter in which he expressed surprise that EAC decided to terminate Plaintiff.  (ECF No. 47-2, Abraczinskas Decl. Ex. B.)  Abraczinskas indicated that Holtec never threatened litigation, that Holtec considered EAC's assurances adequate, that Holtec considered the matter "closed," and that EAC should "feel free to resume" its employment relationship with Plaintiff.  (*Id.*)  Abraczinskas attached to

his letter a copy of Plaintiff's Confidentiality Agreement signed in 2003 (which had expired in 2008) and also explained why Holtec had not earlier provided copies of it, or any other materials requested by Attorney Duba two months earlier—

> [Y]our attorney, Mr. Duba had stated, in reference to his request for a copy of the attached agreement: "[t]o the extent that this request is ignored, [EAC] will conduct its actions going forward *with the understanding that none so exist.*"  Relying on this representation, and because of our inability to easily retrieve the agreement, Holtec chose to decline Mr. Duba's request (as it was encouraged to do) and permit [EAC] to proceed assuming that "none so exist". [*sic*.] Additionally, providing the agreement appeared unnecessary as it was clear to all parties that Holtec had no intention of filing a lawsuit.

(*Id.*)

EAC did not re-employ Plaintiff. Five months later, Plaintiff filed this lawsuit in the Franklin County (Ohio) Court of Common Pleas in January 2011, alleging claims for "Interference with prospective economic advantage" (Count I) and Defamation (Count II). (ECF No. 5.) Holtec removed the action to this Court, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332. (ECF No. 1.) Following discovery, Holtec moved for summary judgment (ECF No. 47), which Plaintiff opposed (ECF No. 48). With Holtec's summary judgment motion fully briefed, the motion now stands ripe for this Court's adjudication.

## II.  Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *see also Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a  verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

      *A.*     *Plaintiff's Defamation Claim*

Plaintiff alleges a claim for defamation under Ohio state law, based on the Holtec Letter of May 27, 2010.  According to the Plaintiff, the letter "falsely advised EAC" that Plaintiff was bound by confidentiality agreements that remained in force.  (ECF No. 5, Compl. at ¶ 9.) Because Plaintiff advised EAC president Charles Hall during the job interview process that Plaintiff was not subject to a non-compete agreement, Plaintiff alleges that the letter was defamatory because it imputed dishonesty to him.  (*Id.*; *see also* ECF No. 48, at 3.)  Even though the letter mentions only a confidentiality agreement and says nothing of a non-compete agreement, Plaintiff nonetheless argues that the letter contradicted the "impression that there was nothing in place . . . that would prevent Mr. Ambro from doing the job that he had applied for" at EAC.  (ECF No. 48, at 3.)

9

Defamation is a false statement published by a defendant, acting with the required degree of fault, that injures a person's reputation, exposes the person to public hatred, contempt, ridicule, shame or disgrace, or adversely affects the person's profession. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995). To establish a valid claim for defamation, a plaintiff must establish that (1) the defendant made a false and defamatory statement; (2) the false statement was published; (3) the plaintiff was injured; and (4) the defendant acted with the required degree of fault. *Celebrezze v. Dayton Newspapers, Inc*. (1988), 41 Ohio App.3d 343, 346-47, 535 N.E.2d 755. Summary judgment in a defendant's favor is appropriate if a plaintiff cannot establish any one of these elements of a defamation case "with convincing clarity." *Id.* (citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St. 2d 116, 413 N.E.2d 1187 (1980)).

With respect to the first element, whether a statement is defamatory is a question of law for the court to decide. *See McGee v. Simon & Schuster,* 154 F. Supp. 2d 1308, 1312-13 (S.D. Ohio 2001) (collecting Ohio cases); *see also BMT Mgmt. LLC v. Sandusky Newspapers, Inc.*, 6th Dist. No. E-08-58, 2009-Ohio-2601, at ¶ 19 (noting that it is for the court to determine "whether the words used in the claimed defamatory statement 'are reasonably capable of any defamatory meaning'") (quoting *Bigelow v. Brumley*, 138 Ohio St. 574, 590, 37 N.E.2d 584 (1941)). In determining whether a written statement (such as the letter in this case) is defamatory, the court must look to the totality of the circumstances. *Belinsky v. Drake Ctr., Inc.*, 117 Ohio App. 3d 497, 507, 690 N.E.2d 1302 (1996).

Defamation in writing falls into two categories — libel *per quod* or libel *per se*. *See McGee* at 1314. At best, Plaintiff alleges a claim of defamation *per quod*. The Holtec Letter's

10

statement that Plaintiff was subject to confidentiality agreements is not defamatory on its face; the nature of the words themselves does not "import an indictable criminal offense involving moral turpitude or infamous punishment, impute[] some loathsome or contagious disease which excludes one from society[,] or tend[] to injure one in his trade or occupation." *Id.* (quoting *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App. 3d 345, 609 N.E.2d 216, 222 (1992) (internal quotations omitted)). Rather, Plaintiff contends the words are defamatory because they "imputed dishonesty" to him. The necessity of an interpretation is the very definition of libel *per quod*. *See Becker v. Toulmin*, 165 Ohio St. 549, 556, 138 N.E.2d 391 (defining libel *per quod* to occur where a statement is not defamatory on its face but "becomes so by the use of an innuendo rendering the apparently harmless words into libelous ones by extrinsic evidence").

Holtec argues that it is entitled to summary judgment on Plaintiff's defamation claim because (1) the letter to EAC was not defamatory and (2) even if it were defamatory, the letter was protected by qualified privilege. (ECF No. 47-1, at 19-22.) We find Holtec's first ground to be well taken and, as a result, have no reason to reach the qualified privilege issue.

### 1. *The Holtec Letter Is Not Defamatory As A Matter of Law.*

As a matter of law, this Court finds that the statements in the Holtec Letter are not capable of defamatory meaning. Plaintiff's entire defamation claim rests on the premise that the Holtec Letter "imputed" dishonesty to him, in that the letter contradicted representations that Plaintiff made during his job interview with EAC. Because Plaintiff had told EAC's President that Plaintiff was not bound by a non-compete agreement, Plaintiff contends that the Holtec Letter — even though it referred only to "confidentiality" agreements and not non-compete obligations — contradicted the "impression" held by EAC's President that "there was nothing in

11

place . . . that would prevent Mr. Ambro from doing the job that he had applied for" with EAC. (ECF No. 48, at 3.)

The problem with the Plaintiff's theory of liability is that the defamatory meaning that he ascribes to the Holtec Letter is not the sort of innuendo that is actionable as defamation *per quod* under Ohio law. In a case of defamation *per quod*, "[t]he function of the innuendo *is explanation; it cannot change or enlarge the sense or meaning of the words.*" *Bigelow*, 138 Ohio St. at 593, 37 N.E.2d at 594 (emphasis added). While the Plaintiff identifies extrinsic facts that give the Holtec Letter a defamatory gloss (*viz.*, the fact that Plaintiff told Hall that he was not subject to a non-compete agreement), his theory enlarges defamation *per quod* beyond its reach.

Plaintiff's theory would require this Court (and ultimately a factfinder) to enlarge the meaning of the words actually used in the Holtec Letter and interpret them in the light of an entirely independent thought that the letter itself does not represent. But in order for a statement to be defamation *per quod*, the extrinsic facts or circumstances giving rise to the "innuendo" must be such that would give the *words in the letter* a "covert meaning not ordinarily applied to them." *Id.* It is a stretch of epic proportion to find that Holtec's statement that Plaintiff is subject to confidentiality agreements (whether true or not) carries the "covert meaning" that Plaintiff is dishonest.

Though not an Ohio case, *S.L.C. Consultants/Constructors, Inc. v. Raab*, 177 A.D. 2d 965, 578 N.Y.S. 2d 284, is consistent with Ohio law and instructive here. In *Raab*, the defendant counterclaimed for defamation based upon a letter sent by the plaintiff to three of the plaintiff's business competitors (and prospective employers of the defendant). *Id.*, 578 N.Y.S. 2d at 285.

The letter set forth the plaintiff's "legal position" with respect to the defendant's obligations under covenants not to compete and of confidentiality. *Id.* The defendant's counterclaim argued that the letter was defamatory by innuendo, in that the letter contradicted the defendant's representation to prospective employers that "he was not bound by the restrictive covenants." *Id.* The appellate court found that the letter was not defamatory as a matter of law. "The 'extrinsic facts'. . . do not explain any statements in the letter, but add 'an entirely new and independent thought that finds no support' in the letter." *Id.* (quoting *Tracy v. Newsday, Inc.*, 5 N.Y. 2d 134, 137, 155 N.E.2d 853 (1959)).

Like the unsuccessful counterclaimant in *Raab*, Plaintiff here is attempting to build a defamation claim upon a letter that is not defamatory on its face or through interpretation of the words in it. To the extent that a reasonable reader could have deemed Plaintiff to have been dishonest based on the Holtec Letter, that impression has nothing to do with the meaning of the words used in the letter. The law of defamation *per quod,* however, reaches only the "covert meaning" of words. The doctrine does not allow Plaintiff to enlarge the words in the Holtec Letter to meaning something they do not say. Yet, that is what this Court would be required to do in order to find the statement actionable under the Ohio law of defamation.

Because Plaintiff cannot show a defamatory statement as a matter of law, Holtec is entitled to summary judgment on Count II of the Complaint.

### 2. *Plaintiff's Theory Lacks Factual Support*

Even if this Court were able to find somehow that the Holtec Letter could be actionable as defamation *per quod*, Plaintiff's claim would still fall by the wayside. In a case alleging defamation *per quod,* after the court finds that a statement may be actionable, "the dispositive

question is whether a reasonable factfinder could conclude that the challenged statements imply a defamatory meaning." *Conway v. Intl. Assn. of Heat and Frost Insulators and Asbestos Workers*, 209 F. Supp. 2d 731, 756 (N.D. Ohio 2002).  Plaintiff's Opposition to Defendant's Motion for Summary Judgment offers stunningly little argument in this regard — and even less evidence.

Plaintiff argues that the Holtec Letter was defamatory "because the false statements reflected injuriously upon plaintiff's professionalism, credibility and ability to do the jab [*sic*] EAC had hired him to do."  (ECF No. 48, at 6; *see also id.* at 3 (arguing that the letter "imputed dishonesty to plaintiff").)  The Plaintiff goes so far as to say that "absent a qualified privilege defense, plaintiff's defamation claim does not fail as a matter of law" because "[g]enuine issues of material fact do exist which should allow the case to proceed to trial."  (*Id.* at 17, 18.)  Missing from the Plaintiff's argument, however, is an identification of record evidence tending to show that he was defamed by the Holtec Letter.

Indeed, there is an absence of evidence that even Mr. Hall (who both interviewed Plaintiff for a job at EAC and read the Holtec Letter) ascribed defamatory meaning to the Holtec Letter.  When asked point blank at his deposition whether he felt he had been misled by Plaintiff after receiving the Holtec Letter, Hall stopped well short of saying he had—

> Q.  [Plaintiff] told you, of course, that he had not signed such a confidentiality agreement and these people at Holtec were telling you that he had.  Would it be fair to say that when you received this letter you figured somebody was misleading or being less than candid with you, either [Plaintiff] or the author of this Holtec letter?
>
> A.  I would say we did not have all of the facts.  I don't want to state that somebody is misleading anything at this point.

14

>> Q. Would you admit that there, obviously, in your mind was some type of discrepancy?
>>
>> A. There definitely is a discrepancy.

(ECF No. 46-1, Hall Dep., at 16-17.)

Thus, at most, Hall acknowledged a "discrepancy" between what Plaintiff told him and what the Holtec Letter said. But even that would not create a genuine factual dispute in this case. Elsewhere in his deposition, Hall testified to his belief that Plaintiff "gave us the information he thought was correct" and that "it was unclear as to what [Plaintiff] may have signed." (*Id.* at 38, 40.) Hall also confirmed that he specifically asked Plaintiff only about whether he was bound by a non-compete agreement (not a confidentiality agreement) and acknowledged his assumption that Plaintiff was truthful when he said he was not. (*Id.* at 68-69.) As a whole, the tenor of Hall's testimony was that EAC was less concerned about whether Plaintiff was truthful as it was with the possibility that Holtec would sue EAC if it continued to employ Plaintiff. Indeed, while Hall would *not* say that Plaintiff was untruthful, he had no problem expressing his belief that *Holtec* was untruthful when it assured Hall that Holtec would not sue EAC over Plaintiff's employment. (*Id.* at 49.)[1]

---

[1] When questioned about a letter he received from Holtec after EAC terminated Plaintiff's employment, Hall testified that he did not believe Holtec to be "accurate" in its representations in that letter:

"Q. Next paragraph, last line, 'Importantly,' he says, he even puts this in italics, 'Importantly, Holtec never threatened or implied that litigation was imminent or even probable in the future.' Do you agree with the accuracy of that statement?

"A. It was our opinion, based on, again, their [Holtec's] actions and more importantly to us the inactions, that we didn't know this to be true.

"Q. So you are saying . . . based upon what they had provided you and what they had not provided you, that you didn't feel, you didn't feel this is an accurate statement?

"A. I would say based on our opinion, that we don't feel this was an accurate statement."
(ECF No. 46-1, Hall Dep., at 49.)

Simply, even if this Court were to find that the Holtec Letter *could* be actionable, Plaintiff has not pointed the Court to evidence from which a reasonable factfinder could conclude that the Holtec Letter implied a defamatory meaning. *Conway*, *supra*. And the most logical place to look for such evidence — the deposition testimony of Mr. Hall, the person who would have ascribed such meaning — does not contain any inkling that Mr. Hall read the Holtec Letter to imply any defamatory meaning.

### 3. *No Need to Reach Qualified Privilege Issue.*

Both sides expend a great deal of effort in arguing the issue of qualified privilege. *See McCartney*, 80 Ohio App. 3d at 354, 609 N.E.2d at 222 (noting that a defendant may claim the "qualified privilege defense" in cases when a plaintiff makes a *prima facie* case of defamation). Holtec argues that the Holtec Letter is protected by qualified privilege, while Plaintiff argues that the doctrine does not apply under the circumstances presented here. (ECF No. 47-1, at 20-24; ECF No. 48, at 3-16.) This Court, however, need not reach the issue of whether a qualified privilege exists in this case. Because the Court has found that Plaintiff has failed to make out a *prima facie* case of defamation due to the absence of any defamatory statement as a matter of law, the qualified privilege defense does not come into play.

### B. *Plaintiff's Tortious Interference Claim*

Plaintiff's Complaint also alleges a claim for "Interference with prospective economic advantage." (ECF No. 5, Compl, at 1.) Holtec argues that Ohio law does not recognize this claim. (ECF no. 47-1, at 24.) Holtec nonetheless construes the claim as one for "Intentional Interference With Employment Relations" and moves for summary judgment on it, arguing that Plaintiff cannot show the requisite elements. (*Id.* at 25-26.) In any event, Holtec argues that its

16

actions are protected by the so-called "fair competition privilege." (*Id.* at 27.) *See Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 707 N.E.2d 853 (1999) (recognizing the "fair competition" privilege in the context of contracts terminable at will).

Defendant Holtec supported its summary judgment motion on Plaintiff's tortious interference claim with citations to deposition testimony and a declaration filed in this case, meeting its burden to demonstrate the absence of a genuine dispute and why it is entitled to judgment as a matter of law. (ECF No. 47-1, at 25-27.) *See* Fed. R. Civ. P. 56(a) and (c)(1)(A). Holtec also set forth its legal argument as to why Plaintiff's tortious interference claim failed as a matter of law. (ECF No. 47-1, at 26-28.) Thus, to defeat summary judgment on his defamation claim, it was incumbent upon the Plaintiff to either cite evidence in the record to show a genuine dispute for trial or to show that the materials cited by Holtec's Motion do not establish the absence of a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1)(A) and (B).

Plaintiff failed to meet his Rule 56 burden to keep his tortious interference claim alive. The first 18 pages of Plaintiff's 19-page Opposition were devoted to opposing summary judgment on his defamation claim. (ECF No. 48, at 1-18.) It was not until the last page, under the heading "Conclusion," that Plaintiff finally got around to addressing summary judgment on the claim he describes as "intentional interference with his employment relationship with EAC."[2] (*Id.* at 19.) His entire argument is that Holtec's "inaction" in response to EAC's request for documentation of Plaintiff's confidentiality agreements (if any) with Holtec are not "protected

---

[2] It is undisputed that Plaintiff was an at-will employee of EAC at the time EAC terminated his employment. Thus, to the extent Plaintiff had a claim, the applicable cause of action was tortious interference with employment relations. *See Mitchell v. Mid-Ohio Emergency Servs.*, 10th Dist. No. 03AP-981, 2004-Ohio-5264, at ¶ 30 n.6.

17

by the qualified privilege." (*Id.*)  Plaintiff does not cite to any Ohio cases regarding the tort of interference with employment relations; rather, he simply contends that he "has offered testimony and materials which he feels show that there are genuine issues of material fact as to whether the occasion should be privileged or whether, if privileged, the privilege was abused." (*Id.*)

Regardless of how Plaintiff "feels" about what the evidence shows, his feelings are not enough to overcome summary judgment.  Under Ohio law, the tort of wrongful interference with an employment relationship requires a plaintiff to show that an outsider to his employment relationship maliciously or wantonly procured the termination of the plaintiff's employment. *Dryden v. Cincinnati Bell Tel.*, 135 Ohio App. 3d 394, 400, 734 N.E.2d 409 (1999); *see also Contadino v. Tilow*, 68 Ohio App. 3d 463, 467, 589 N.E.2d 48 (1990).  Plaintiff has not identified a genuine dispute of material fact with regard to whether Holtec *maliciously or wantonly* procured the termination of his employment with EAC.

At most, Plaintiff has shown that Holtec (1) identified certain "confidentiality agreements" that were not truly "agreements" (in the contractual sense) and then (2) did not provide EAC with follow-up information in response to EAC's request for clarification of those "agreements."  (ECF No. 48, at 19.)  But this does not create a genuine dispute on the salient issue, which is whether Holtec maliciously sought the *termination* of his employment with EAC.  On this issue, Holtec points to evidence that it did *not* seek Plaintiff's termination, namely, the Abraczinskas Declaration and the August 10, 2010 letter in which Abraczinskas observed that it had never taken the position that Plaintiff was precluded from working for EAC or that Holtec intended to sue EAC over its employment of Plaintiff.  (ECF No. 47-2, Ex. B.)

18

Rather than identify evidence to show a genuine dispute, Plaintiff has come forward with evidence that only solidifies the absence of one.  Plaintiff argues that Holtec's tortious conduct is reflected by the fact that it "refus[ed] to comply with EAC's repeated requests for the documents stated (falsely) to have been signed by plaintiff."  (ECF No. 48, at 19.)  This inaction, Plaintiff says, directly led to EAC's decision to terminate his employment.

Plaintiff's argument confuses the distinct issues of causation and malice.  While Holtec's "inaction" in failing to timely comply with EAC's requests for documentation of Plaintiff's contractual obligations may have caused the decision to end his employment (assuming the veracity of EAC's representation in that regard), that fact does not create a genuine dispute on the issue of whether Holtec *maliciously* sought out the termination of Plaintiff's employment.  *EAC's* motivation says nothing of *Holtec's* intent.  And here, it strains logic to see how the "inaction" of which Plaintiff complains can be indicative of malice on the part of Holtec.

When EAC asked Holtec to provide documentation of Plaintiff's confidentiality obligations, EAC warned that if Holtec did not do so, it would "conduct its actions going forward *with the understanding that none so exist*."  (ECF No. 46-2, Hall Dep., Ex 7 (emphasis added).)  In response to this challenge, Holtec provided no such documents.  The "inaction" in response to EAC's request is significant, but not for the reason Plaintiff tries to sell to this Court.  EAC's letter put Holtec on notice that if Holtec did not provide proof of Plaintiff's contractual obligations, EAC would consider the Plaintiff free from any legal impediment to his employment with EAC.  With full knowledge that EAC would deem Plaintiff free to work for EAC without any confidentiality obligations if Holtec did not respond, Holtec nonetheless chose not to provide documentation of Plaintiff's obligations, claiming that it felt satisfied that EAC would not allow

19

Plaintiff to utilize Holtec's trade secrets.  (ECF No. 47-2, Abraczinskas Decl., ¶ 14 and Ex. B.)

The "inaction" in this context *supports* Holtec's contention that it did not intend for EAC to terminate Plaintiff's employment.  By not responding to EAC's demand for documentation to substantiate Holtec's position, Holtec was all but inviting EAC to do exactly what EAC said it would do: consider the confidentiality agreements nonexistent and proceed with its employ of Plaintiff under that premise.  This "inaction" by Holtec cuts against the notion that Holtec sought Plaintiff's termination, much less that it did so with malice.

Plaintiff has not created a genuine dispute on the issue of whether Holtec procured the termination of his employment with EAC with the requisite malice that would allow liability for tortious interference with employment relations under Ohio law.  Summary judgment in Holtec's favor is therefore appropriate on Count I of the Complaint.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 47) is **GRANTED**.    The Clerk is **DIRECTED to ENTER JUDGMENT** in favor of the Defendant in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**